Thank you. May it please the court, Hashim Mupen for the United States. I'd like to reserve seven minutes for rebuttal. The proclamation reflects a multi-agency, worldwide review, engagement, and recommendation process. And the substantive findings are that eight countries have inadequate information sharing practices or other risk factors that undermine the visa entry restrictions in order to encourage those countries to improve their practices and to protect this country until they do so. What do you mean by tailored? They're tailored because for certain countries, the restrictions are for both immigrant and non-immigrant visas. For other countries, it's only for a subset of the non-immigrant visas, Your Honor. But does tailored include the idea that some could come in and others could not? Well, in addition, there is a waiver process. But when I was referencing the fact that it is tailored, I was primarily referencing the fact that the restrictions are not one size fits all for the countries, which reflects the fact that the President was setting restrictions in a manner that were designed to encourage countries to improve their practices. In light of both these procedural and substantive features, the proclamation falls well within the President's broad statutory and constitutional— Is the purpose of—that you just articulated, to encourage or nudge other countries to improve on their practices that the proclamation finds questions, does that fall—I mean, is that one of the purposes of 1182-F? It is— Does he think it falls right within the scope of that statute? I think it does, Your Honor. How is that? I'll make several points. So the language of 1182-F, the question is whether the entry of nationals would be detrimental to the national interest. And when certain countries are engaging in practices that are harmful to the government, it is well within the President's authority to determine that allowing the nationals of those countries to enter would be detrimental to the national interest because it doesn't sanction and deter those harmful practices. This is precisely what, for example, President Carter found with respect to the Iranian hostage crisis and what President Reagan found with respect to a diplomatic dispute with Cuba. In both of those cases, the harm was from the foreign governments themselves. They had engaged in harmful practices to the country. And what those presidents found was allowing the nationals of those countries to enter. Even though there was no argument, no suggestion that the nationals themselves presented any harm, allowing those nationals to enter was found detrimental to the national interest because the presidents wanted to put pressure on foreign governments. That's a quintessential exercise of 1182-F. And indeed, it's not just Iran and Cuba. It's virtually every application of 1182-F has this critical function. If you look at the plaintiffs' briefs themselves, they emphasize that most of the proclamations have been focused on targeting individuals who engaged in harmful behavior abroad. But the proclamation, it does not, it's your view, or I understand your comment, that nationals from the countries who are covered by the proclamation are not themselves of concern? So that is, they're not, they don't pose a threat then, the nationals. They need not, as your initial question was whether they have to, and under the statute they need not, and I think the Iranian and Cuban examples prove that. Now in this case, it is a stronger case for us than both the Iran and Cuba examples, because not only is there harm from the foreign governments, but that harm is related to the threat and risk posed by their nationals. But if I could just finish the point I was making a second ago, it's not just Iran and Cuba, it's virtually every proclamation that has ever issued under 1182-F. If you look at the examples that they cite in their brief that are discussed in the CRS report, most of those proclamations are based on finding that specific individuals, either government officials or private parties, had engaged in harmful behavior abroad. No one was suggesting that them coming into the country was in and of itself harmful, that they were going to engage in harmful behavior in the United States. The rationale of those restrictions was having engaged in behavior harmful to the United States abroad, it was deemed detrimental to the national interest to allow them to enter. Mr. Pan, do you recognize any limit under 1182 to the President's authority? It has to be relevant to the, he has to make a determination that is detrimental to the national interest, your honor, and we don't dispute that there might be outer bounds to that limit, both in terms of the substance of the restrictions, whether it's focusing on foreign policy and national security, as opposed to other sort of ends, or if the means of the restriction are inconsistent or contrary to congressional commands in the INA. But the proclamation here falls well within the core of 1182-F restrictions because it's focusing on ends that are national security and foreign policy based, and it has a means that is a additional restrictions in circumstances where those national security and foreign policy concerns are implicated. So if you were in my position where we have to sort of interpret this statute, try to understand it, how it fits, how it works, how would you characterize the limits that are imposed on the President when he invokes his authority under 1182? So as I said, your honor, I think the two things that I would focus on as potential limits at the outer bounds, though we don't think we come anywhere near these, are the interests that the President is articulating, the sort of interests that would be within the national interest, or are they other sort of interests that don't implicate the sort of core foreign policy and national security concerns that have traditionally been used under the statute, and are the restrictions contrary to something about the INA? So examples have been given, for example, if the President were to say, I just think it's a bad idea, I'm not going to have any immigrant visas come in, that would be contrary to this sort of INA scheme, but what's happening here is fundamentally different. The argument that we see, we've seen throughout these various iterations of the proclamation and of the prior executive orders, is that in certain countries, there are Muslim radicals who we do not want to enter this country, and that exercising the authority under 1182-F is a way of keeping them out. Your honor, the proclamation's findings are different from what you just articulated. The findings of the proclamation? That's the argument that we have heard, and that's the argument we're going to hear from the plaintiffs. Well, what I would just submit is that what the proclamation says is that after a multi-agency review, there are information-sharing deficiencies from these eight countries or other risk factors that undermine the visa vetting system. These findings that are articulated in the current proclamation are the result of the 90 or so day study that we permitted the government to undertake. That's precisely right, your honor, and if I could lay out sort of what that process was, because I think it will be helpful to Judge Paias. I have a question in advance of that. Do you, as a legal matter, matter of law, do you think 1152-A constrains the President's authority under 1182 at all? I don't think so, your honor. Explain why not. So I will. The key is 1152 bans nationality discrimination in the issuance of immigrant visas. Now the first step to the analysis is to recall, as the INA makes crystal clear, that having an immigrant visa does not entitle you to entry to the country. It is always the case that when you have an immigrant visa, you still have to be found admissible. So it would be very strange if Congress passed a statute saying no discrimination with respect to the issuance of immigrant visas, if what they actually wanted to do was restrict the President's ability to make determinations about who is admissible to the country under 1182-F. Now if you look at the legislative history of the statute, it confirms this. The legislative history makes clear, as plaintiffs themselves emphasize, that the point of 1152 was to wipe out the national origins quotas for immigrant visas, quotas that were based on an attempt to balance, have ethnic and racial balancing in the country. The legislative history makes crystal clear, however, that the point was not to affect the eligibility criteria to enter the country. It was not to lax in the admissibility grounds. You're talking about eligibility. The question is, can the President, under the authority of 1182, push aside the restriction on the issuance of immigrant visas that Congress later enacted in 1152? Well, but I think you are actually talking about restricting the eligibility criteria, because remember, 1182-F, just like 1182-A, those are statutory provisions that determine who can enter the country. Who is admissible to enter under 1182-A and under 1182-F, whether the President can suspend their entry. And there's just no suggestion in the legislative history that the decision to restrict immigrant visas was meant to restrict the President's antecedent authority to determine who can enter the country. So we're back to the Tom Hanks example of being stateless inside the airport terminal? Well, no, Your Honor. What I would submit is that precisely because 1152 is about immigrant visa issuance, it was not meant to suggest that you have to grant a visa to someone who's not eligible to enter in the first place. So it's not the Tom Hanks scenario, because you never get a- That's precisely the point, I think. That's how the administration intends to enforce its authority under this proclamation and to, by some people's lights, work around 1152 is by saying, we're not going to allow them to be issued and you're not going to be allowed to enter. My point is, Your Honor- Am I right about that? You are right that- That's the vehicle the administration has chosen to enforce its authority under the proclamation in 1182, correct? It's not just this administration, it's the traditional practice that if someone is not admissible, they don't get immigrant visas. We're not talking about the past administration or a future one. We're talking about this administration and the authority of the President of the United States under these two apparently warring sections of the Immigration Act. Your predecessors who have argued in front of us have told us that the administration intends to use the bar entry authority to prevent the issuance of immigrant visas, which based on these countries, based on their nationality. That's right, Your Honor, but again, if Congress- And you think that's okay? We do think that that's okay. Well, I have two points, Your Honor. The first point is that we do think that's okay and the reason we think it's okay is what I had suggested earlier, which is that when Congress said that there would be no nationality discrimination with respect to the issuance of immigrant visas, it didn't intend to restrict the ability of the President to make admissibility determinations on the country at all. You nevertheless have to get an immigrant visa. So, just to be clear, the administration intends to tell counselor officers and officials in the affected countries that they're not to even issue an immigrant visa because they're not going to be allowed to enter in any event. That's correct, Your Honor, and that's precisely, for example, how President Carter's Iranian proclamation was enforced. President Carter said that no Iranian immigrants could come into the country during the Iranian hostage crisis and they didn't get immigrant visas and then all fly here and then have to turn home. The way it was enforced is that the visas didn't issue. So too with President Reagan with the Cuban proclamation. Immigration was suspended from Cuba and that included the visas. The simple fact is that, again, the error in their position is that they assume that immigrant visas entitle you to enter the country and that is just not true. So, as a wholly apart from 1182F, it is a basic principle that a visa does not entitle you to entry to the country under 1201G. I think we understand your point. Okay, Your Honor. Counsel, if I could ask you a question that goes to the argument you made in your briefing that this is a non-justiciable issue that, in other words, as I understood, that when the President makes a decision under 1182F, that's a decision by the political branches and the court has no authority to review it. Am I right? That's correct, Your Honor. So, I'll give you my hypothetical. Can I just clarify one thing before? That point is with respect to statutory claims. With respect to constitutional claims, the analysis is slightly different. All right. That's fine. So, now, here's my hypothetical for you. And I realize that I'm going to say it in an extreme case, but sometimes hypotheticals help us to understand the limits of a principle. Let's say the President sat down with his Cabinet and they discussed things and decided the world's a very dangerous place these days, in fact, it's so dangerous that the President decided he's going to exclude entry from any person from any place in the world if they're not American citizens under authority of 1182F. And they make some detrimentality finding that it would be dangerous to U.S. residents if there were such entry. So would that be justiciable? I don't think so, Your Honor. So, let me proceed in two steps. So, first of all, something like that, I don't even think that there would possibly be a constitutional argument, but let's focus on the statutory piece for a second. On the statutory piece, the Supreme Court has made clear repeatedly that the decision of the political branch is to allow aliens to enter the country is a political decision that courts cannot review unless Congress is expressly authorized otherwise. And there simply is no express authorization here. They haven't pointed to any express authorization. They've pointed to the APA and equity, but we know that neither the APA nor equity can override the principle of non-reviewability because it doesn't do so for consular officers. Nothing about the APA and nothing about equity somehow says that consular officers' decisions, even on extreme hypotheticals like the one you just gave, are somehow immune from review, but that the President of the United States is subject to review. It gets things completely backwards. So my follow-up question to that is, okay, it sounds to me like you're saying that Article III branch, the courts, are ruled out entirely if the President makes a detrimentality finding under 1182F. Not completely ruled out, Your Honor. Not as to a statutory. For statutory claims. For a statutory claim if courts thought there was no merit to the detrimentality finding. But they were ruled out of that. Now, so my follow-up question is, let's assume that the President made a mistake in interpreting 1182F and that the President's position is really contrary to what Congress intended to what Article I Congress intended. Is that still non-justiciable? That is still not reviewable, and again, I would point Your Honor to the fact that that's equally true for an individual consular officer. An individual consular officer is just as capable of misinterpreting the INA to misreading it, to misapplying it, and it is black-letter law and they don't dispute that that is not reviewable. I would point Your Honor to . . . Okay. I understand your argument. I just wanted to make sure I understood your position. So the courts would be totally ruled out of that case even if the President was misinterpreting the statute. So now my further follow-up is, if we're ruled out under Article III, I take it the Supreme Court's ruling on Article III applies to the whole judiciary? That's true, Your Honor, but again, remember, we're talking about statutory claims here, and so all we're saying when we say it's ruled out is unless Congress provides otherwise. Congress created the statutory claim. Congress could have but has not provided a judicial remedy. If you're talking about constitutional claims, on the other hand, the rule is different. We agree that for constitutional claims, if a U.S. citizen can show a violation of his own constitutional rights, review is available. But so on your hypothetical, I think it's important to emphasize that we're talking about statutory claims. And if Congress created the statute, but Congress chooses not to provide a judicial remedy, that should be no concern of the courts. It is Congress's statute to begin with, and if Congress hasn't provided a remedy, that's up to Congress to do. There's no concern for that, and no one has thought that that's a problem when it comes to individual consular officers. Individual consular officers can misinterpret the INA, and they are not subject to judicial review. I'd point this court to the Romero decision from the Eastern District of Virginia. It's cited in the D.C. Circuit's opinion in Savita-Bruno. It makes exactly this point, that even statutory violations are not subject to review under the doctrine of consular non-reviewability, and it cites cases so holding, including a case I believe from the Fifth Circuit. There's just no explanation that they can provide for why an individual consular officer can misinterpret the INA, but not be subject to review, but that the President of the United States is subject to judicial review turns everything on its head, because the APA and equity don't provide greater relief against the President than the consular officers. It's exactly the opposite. The President's not subject to the APA at all, and he's not supposed to be subject to injunctive relief either. What about his subordinate officers? Hm? What about his subordinate officers? So his subordinate officers... That is, there are cases that recognize, in this kind of circumstance, that where, correct, you may not be able to claim directly against the President, but the Secretary of State or the Secretary of Homeland Security and all the underlying officials who are implementing the President's policy, why aren't they subject to an action? So subordinate officers... And there are cases that talk about it in terms, not so much as equitable, but as a non-statutory cause of action, where the policies that are being implemented are contrary to the statute. Right. So in general, it is certainly true that subordinate executive branch officers are both subject to the APA and sometimes to implied equitable causes of action, but critically, what is not true is that they are subject to such a review for the exclusion of aliens abroad. That is precisely the doctrine of consular non-reviewability. They're not going to be able to stand up and cite a single case that says that when a consular officer excludes an alien abroad, even in violation of statute, that you could sue them under the APA, under the equity, or under anything else. And that's because there is a background principle that has existed for this entire country's history that that type of decision is committed... But the focus of their lawsuit is against the proclamation. I understand that. It's a broad scheme that's adopted through the proclamation. That's true, Your Honor, but the doctrine of consular non-reviewability is not based on some sort of piont of bureaucratic discretion. If you read the cases, they're not saying that the reason we're not going to engage in judicial review is because this is an interstitial decision that a low-level bureaucrat is deciding. The rationale of the decision, of all these decisions, is that the decision to exclude aliens abroad is a fundamentally political decision of foreign policy that is committed to the political branches unless Congress provides otherwise. I would commend, Your Honor, to the D.C. Circuit's decision in Savita-Bruno. If you just read the rationale of that case and then ask, does it apply a fortiori to the President, I think the answer is unambiguously yes. Well, let me ask, let me go back to 1182 for just a minute. I had one other question with respect to 1182F, which is the text, if you go to the text of the statute, it connotes to me, at least, that when the President acts under 1182F, it should be for a definite period of time. It appears that the proclamation is for an indefinite period of time. So I think that's not right for at least a couple of reasons, Your Honor, so first Why, if you go to the statute, it talks about would be detrimental to the interest of the United States, he may by proclamation for such period as he shall deem necessary suspend. Right. That to me suggests that there's some limitation within the statute itself as to duration and to the circumstances under which the President is to act. I'll say a couple of things about that, Your Honor. So first of all, the statute says for such period, it doesn't specify what the outer bound of that period is. No, I understand. Second, this proclamation is far less indefinite than proclamations in the past. For example, the Iranian hostage crisis proclamation and the Cuban diplomatic dispute proclamation, both of those just also indefinitely suspended entry without any sort of fixed firm end date. For example, in the Cuban proclamation, that diplomatic dispute had been going on for 15 months by the time that President Reagan imposed the entry restrictions. There was no reason to assume that that would be finished any sooner than this one. And what I will point out finally on this point is that this proclamation actually does have provisions in Section 4 for continuously considering the length of the suspension. Every 180 days, it will be revisited. Those proclamations didn't even have that. So there's just simply no way to say that this proclamation violates 182F without saying all of those ones did too. But there is no definite time period on it. And this proclamation, like the others that have preceded it, do not have a fixed clock on it. The other question that I had that we were getting at was, how does 1182F fit into all the other provisions of 1182? That is, Congress has set forth a whole host of provisions dealing to entry and non-admission and recently they added the provisions regarding terrorists and whatnot. This seems, the proclamation just seems to disregard everything that Congress has laid out. I don't think that's right, Your Honor. Why not? Because what 1182F does is provide the President with additional authority over and above 1182F to make findings of detriment to the national interest. And I would point, Your Honor, to the D.C. Circuit's decision in Aberesk and the First Circuit's decision in Allende, which involved exactly this and in fact on much starker facts. In those cases, what both of those circuits held was there was a visa, there was a ground for visa inadmissibility that the courts both held only applied if the alien's activities within the country were harmful in a certain way, not their mere entry. Nevertheless, both of those courts said the President, however, under 1182F, could say that mere entry alone was detrimental to the national interest. So in that case, you had an express limitation on a visa inadmissibility ground in 1182F and both of those circuits said that the President nevertheless could, had been authorized to impose additional restrictions. I would also point, Your Honor, to the Supreme Court's decision in Sale. In Sale, there was a provision of the INA that provided illegal aliens with various protections and exclusion procedures, but that statute only applied territorially. What the President did was he established a blockade outside of the territorial waters precisely to avoid triggering that statute. And the court said, I believe eight to one, that that was clearly within his authority to use 1182F to avoid triggering the restrictions in the INA. Quick question before you sit down and we eat into your rebuttal time. 1152A, this is the one that prohibits discrimination based on nationality, has a clause in it. I have it about right. It says, except as otherwise provided, and it lists specific subsections of the INA, it does not list 1182F. What do you make of that? So, what I make of that is if you look at the exceptions that are listed there specifically, those were all added to the INA at the same time as 1152 was. However, no one, including them, is going to say that that is the exclusive list of exceptions to 1152 because, for example, section 1253D of the INA expressly authorizes denying both immigrant visas and non-immigrant visas based on nationality in certain circumstances. There is curious, isn't it, that if Congress did intend that the 1182F could override anything else in the INA, that they would leave that off the list of 1152? It is kind of curious, isn't it? I don't think it's any more curious, Your Honor, than the fact that they didn't specifically list other pre-existing provisions of the INA that authorize nationality discrimination, including, as I said, the provision I just cited, 1253D. That is actually about immigrant visas. It specifically authorizes nationality discrimination for immigrant visas, and nevertheless, it's still not listed as an exception in 1152, a foreshore, I would think, that 1152 does not impliedly repeal 1182F. One last point on 1152, Your Honor, and then I'd like to reserve the remainder of my time. On their reading, the suggestion would be that even in cases of countries where we were on brink of war, or where there was unidentified threats from foreign nationals, we couldn't suspend entry and suspend immigrant visas. Their only response to that is to say, oh, well, that's okay, because that would be a compelling interest, and therefore, there's somehow an exception to 1152, but that's simply not in the statute. The statute doesn't say discrimination unless you have a good reason to engage in discrimination. When federal statutes create exemptions to discrimination provisions, they say so expressly. Thank you, Your Honor. Okay. Thank you, counsel. By the way, for counsel's purposes, planning rebuttal argument, I'm just going to sort of arbitrarily add five minutes to your rebuttal time, and I'll give the same extra time to the appellees if they want to. Thank you, Judge Gould, and may it please the Court. Mitchell Rice for the plaintiffs. I'll be discussing the justiciability and reviewability issues, and then my colleague Neil Coucho will discuss the merits. This is now the third order the President has issued this year, purporting to ban over 150 million foreign nationals, most of them Muslims, and to dramatically reshape the immigration laws Congress designed. Every time the government's been before this Court, it's made arguments just like the ones you heard my opponent make a few minutes ago. This is a little bit different, isn't it? I mean, the prior two versions of the executive orders were based a bit on speculation. We've now had a 90-day period in which the government and its agencies, the Homeland Security, the Department of State, et cetera, have gone through and, in part, based on information provided by the past administration, have determined that there are certain countries in the world that you can't tell if Person A is really Person A. What's wrong with that? Well, my colleague will get into the merits more, but I think this Court laid out very any respect in which the existing case-by-case vetting process is failing, that the burden is on the alien to show they're admissible, and if they can't produce documents sufficient to do so, then they can be denied entry. Even if the documents themselves are infirm, historically infirm? For each of the country bans, the government would trust Kim Jong-un to say, this person is really this person. You've got to take him in. Well, for each of these countries, the government is allowing many of these people in on non-immigrant visas, so I don't think the government's made the contention, and there's nowhere in the text of the order the government has argued that it's incapable under the existing process of denying entry to harmful aliens. That's just finding isn't in the order, and when they purport to show one, they say just that the documents are insufficient, but I think my colleague will get into the merits more. I do want to get onto the justiciability. What do you propose, and if this is in your colleagues, just tell me, what do you propose as a remedy? That we have a trial in district court? We think that the record before the preliminary injunction is all that you need to find this order unlawful. We've made allegations. There's no disputed questions of fact here. The order just does not contain, meet what you called the essential preconditions for invocation of 1182-F. It does not contain a finding that supports the exclusion, and it does not, under a century of practice, under a century of interpretation, describe a way that these aliens would be detrimental to the interests of the United States, but I do want to address my opponent's, sorry, Your Honor. I want you to address it, because I want you to address what Mr. Mupon was just saying. Yes. Which is that, as I understand his argument, well, there may well be 1331 general jurisdiction. There isn't a vehicle with which to get at these statutory claims. Yes, Your Honor. And we think we have a clear cause of action here. There's the APA cause of action, and then there's the non-statutory cause of action, which I didn't hear my opponent deny exists as a route to review of the President's proclamation. His argument is consular non-reviewability bars the claims. And I think you should pause on the breathtaking argument you heard the United States government make, and it's in their briefs at page 6. The President can, or any officer in the executive branch, can, quote, brazenly violate the immigration laws, can ban every alien from the country in clear violation of 1182F, and no court can review that violation. Indeed, they say in their brief, plaintiffs only recourse to the political process. And that's not the way the system works, and that's not the way the law of consular non-reviewability has ever worked. And I want to be very clear on this point. For individual consular officers, and a fortiori for the President, there is review of statutory violations. My opponent said we can't cite a single case saying that consular officials' violations of statutes are unreviewable. Well, let me cite you one from this court. Rivas Pinapolitano at 714F, 3rd 1108, said this. A court has jurisdiction to review a consular officer's actions when the suit challenges the authority of the consular to take an action, as opposed to a decision within the consular's discretion. And the case they rely on, their principal authority here at Saavedra Bruno, which was a discretionary decision by a consul, the court emphasized this was a decision wholly within his discretion, and a challenge to the sufficiency of the evidence. What we have here is a violation of statute, and in both Rivas and in the case that cites Patel, I urge you to read them, the court reviewed violations of law by consuls and in one case invalidated the visa decision as a result of them. Moreover, this court, in Washington and in Hawaii, heard the same arguments you heard my opponent make. And in both cases, it held that the doctrine of consular non-reviewability has never been applied beyond an individual consular decision to grant or deny a visa. It does not apply to immigration policies. And that was correct. The Washington decision remains binding. And that's true for a number of good reasons. The immigration laws insulate individual consular decisions from review. In 1104A, they provide that even the Secretary of State cannot control individual visa decisions. And in 1201I, they state that a consular officer can revoke a visa at any time in his sole discretion, and that decision is unreviewable. So Congress chose to make individual visa decisions unreviewable. Congress did not choose to make immigration policies unreviewable. And indeed, in Knopf and in Sale, the Supreme Court reviewed those decisions under an order issued under 1182F and its immediate predecessor. I might add, in Sale, in the face of the government's vigorous argument that consular non-reviewability barred the claims, they argued that in their brief Senate oral argument, and no justice on the Court accepted that argument, notwithstanding that when consular non-reviewability applies, it's a limit on the Court's subject matter jurisdiction. So the Court cannot have skipped the question. So I think that the argument you've heard, it's not true of individual consuls. It's certainly not true of the President. And if that was correct, that would be quite a staggering blow to the separation of powers, that the President could essentially usurp the limits Congress had placed on his authority with impunity, and this Court would have no authority to review them. I'd just like to touch briefly on finality and zone of interest. I think this Court decisively addressed those issues in its prior opinion. The notion that the waiver process renders these claims unripe is simply incorrect. We have detailed declarations by every plaintiff documenting the present harms every plaintiff is suffering, irrespective of the waiver by virtue of this order. 254, the record the university can't recruit students. Paragraph 99 of the complaint, multiple speakers speaking events that can't be held. The individual plaintiffs are being separated from their families, and the remote discretionary prospect of a waiver would in no way ameliorate those harms or repair the unequal treatment these plaintiffs are suffering. If there are no further questions, I'll address this ability. Do you agree that by its terms, 1152A only applies to immigrant visas? I think the Court pointed, I think for, 1152A by its terms is limited to immigrant visas. But as my colleague will discuss, since the enactment of the statute, one year later, Judge Friendly's opinion recognized that that was a dramatic alteration to the immigration system, that Congress had taken nationality off the table as a relevant consideration. And in Gene V. Nelson, the Court said that because nationality is generally a disfavored characteristic, individual immigration officers exercising discretion can't generally discriminate on the basis of nationality. So we think there's a broader principle embodied in the immigration laws. But I'll let my colleague address that. The answer to my question is yes. We agree on the text, it's limited to immigrant visas. Thank you. Thank you. Thank you, Judge Gould, and may it please the Court, it's an honor to be before you again. There are four separate arguments on the merits. Each explains why the President's unprecedented and sweeping ban is illegal, and each is supported by prior decisions of this Court involving Executive Orders 1 and 2. The four arguments are, first, under Section 1182, the President has not made findings that support his conclusion that the entry of nationals from these countries would harm the United States. Second, 1182 separately requires the harm to be detrimental to the interests of the United States. He has to actually use those words? Oh, he doesn't have to use those words, but I think he does have to do what his predecessors have done and follow the practice, and I'll explain that in a moment. But, you know, it can either be that the individuals themselves are harmful, spies, saboteurs, and the like, or that it's a kind of, at the outer bounds, an emergency situation or something like that. So when the 46 other Executive Orders on this subject matter have been issued, all contain what you're describing? Well, I do think that they all meet what I'm describing, yes. And here's why, Judge Hawkins, and this was your question that you were starting to ask my colleague right at the beginning. You said, isn't this Executive Order different? Isn't there now a worldwide review? And I think that fails for two reasons. One is that they have not made the findings that this Court called for under 1182. And second, the findings they do make are not the ones that are detrimental to the United States. Let me walk you through that. Maybe just before doing that, let me get the last two arguments out, which are the 1152 violation, that's the third problem, the nondiscrimination, and the fourth is the First Amendment and So to answer your question posed to my colleague, here's the problem. Here's what you said in your Hawaii decision at page 773. Quote, although the order explains conditions in the six countries lessen their government's ability to share information, the order specifically avoids making any finding that the current screening processes are inadequate. As the law stands, an applicant bears the burden of showing the applicant is eligible to receive a visa or other document for entry, 8 U.S.C. 1361. The order offers no further reason explaining how these individualized adjudications processes flawed such that permitting entry of an entire class of nationals is injurious to the interests of the United States. Now, that's what you said. It was your clear holding. He then had his vaunted, you know, seven agency worldwide review. Where did they ever find what you called for, which is that the individualized vetting process isn't working? My colleague on the other side just began his oral argument with, I think, these words. He said, this executive order is, quote, a multi-agency worldwide review process. Eight countries have inadequate information that undermines the visa vetting systems. There is zero language in this executive order about undermining the visa systems. They have not made the finding. And this is quite remarkable. You as the Court of Appeals said, here's what you have to do, Mr. President. You have wide discretion under 1182. The State of Hawaii is not disagreeing with that. But you've got to make a finding that the individualized vetting process isn't working. And in the teeth of that, what did they come back with? Zero. They've talked about bargaining and diplomacy and information restrictions. But what you said before was, why does any of that matter, the information sharing? The burden is always on the individual visa applicant to come to the United States. And if you can't show any bad folks are coming here, then there is no 1182 finding. Their answer is like to say, well, you know, there's all sorts of information problems there. But the information problems, the identity management problems, the dictator who we're worried about giving false information, as long as the individualized vetting system is working, that's enough. And you have before you again, just as you did last time, national security experts saying exactly that. That's at the excerpts of record at page 55. You know, people like Secretary Albright and Senator Lugar and Senator, General Hayden saying that. But I don't think you even have to get to the record or anything like that. You made a clear request, a clear requirement to the government. I mean, when I was in the government, if a court, even a district court or even, you know, some small whatever court said, you've got to make this finding and then you have a long interagency process and they didn't make it, boy, that's a dog that really didn't bark. And so, you know, even if you concede everything about, you know, giving wide berth, deferential and so on, they have not made the finding that this court required. That's the first and I think most significant problem when we deal with 1182. Let me ask, were we too demanding in our prior opinion? I don't think so. I think it's something any president should be able to meet. I mean, you know, Judge Paez, the idea that a president is going to, you know, is going to be constrained in some way, no, I think all you said was make a finding that there's something bad going on, that entry is harmful and, you know, I do think it's telling that with all of these agencies and all of this review, they couldn't do it. And I think, you know, the national security experts tell you one reason why, which is the individual vetting system is working, but you don't have to get there and have that debate. It's just you made a procedural request, make the finding, they didn't do it. Now, there's also a substantive part of 1182, and that's what your question to my colleague was getting at, which is this bargaining chip idea, and, you know, the bargaining chip, even if you conceded the bargaining chip, you know, that they want extra information and vetting, and, you know, I don't think that that's going to qualify, but even if you thought it would, they'd have to first identify again that some bad people are coming into the United States. It's kind of like, you know, those coin sorting systems when you go to a bank and, you know, and the government is saying, well, you know, the President is saying, well, there's someone throwing in some buttons to the system, some spurious material. Well, that doesn't matter, the input, as long as the filter is working. And what this Court said is, it looks like the filter is working. Tell us why it's not, Mr. President. Make a finding that the individualized vetting system isn't working. They have not done that. Now, there's also a substantive problem, as I was saying, which is, you know, that 1182 doesn't, I think, permit the kind of, you know, foreign policy harms writ large that he's talking about here. You know, the text of the statute is the President has defined that the entry must be detrimental. And earlier, your predecessors, your earlier decision in June said, for example, government resources or something isn't entry being harmful. And similarly here, the entry here that he's asserting, this bargaining chip, is not itself showing that there's any immigrants right now coming or folks on visas that is detrimental to the interests of the United States. So that's why we think 1182, again, we concede that there's a lot of discretion for the President, and no President has any trouble meeting this standard in the past. And that's what the CRS report says. But this is really a step that's very different. And, you know, if you read the government's brief, you get the view that, oh, Presidents do this all the time, and things like that. Absolutely not. They've been able to muster, you know, in the 45 or so instances of the President using 1182 over the last 70 years, two examples tops, and neither of them is very good for exactly the reasons you said in footnote 13 of your predecessor opinion. Those are exigency, emergency circumstances done to address a diplomatic, retaliatory, fast-moving action, certainly not something like this, in which the President has had ten months in office. He's saying this is important for national security, and yet he's never, in the teeth of being struck down time and again, gone to Congress and say, hey, set up this vetting system, improve it, do whatever. That's what Presidents did after 9-11 and the 2004 Act and other things. Nothing like that here. Instead, he is asserting, and this, Judge Gould, goes to your hypothetical, which I found, you know, his response very telling. The idea that the President can ban all immigration from around the world and this Court would be powerless to review it, I mean, his argument is essentially the President can take an iron wrecking ball to the Immigration Code, that finely reticulated system that Congress has done, and put the President in the driver's seat. That certainly may be some Constitution. It is not the Constitution of the United States. And Judge Paez, as you were saying earlier to my colleague on the other side, 1182 itself, forget about just the whole INA, his argument would allow the wrecking ball or line item veto over any provision in 1182. Congress has really thought with a fine-grained, ten-part reticulated test about excluding people for terrorism, and it hasn't done anything like this dragnet, which he is engaged in. Let me ask you, just before you shift off this, in just trying to understand how this statute works or should work, and even acknowledging what we said before, if you just stand back and look at it for a moment, to what extent should the Court, or how deeply should the Court dive into trying to criticize or look at the President's findings? Right. So first, he's just got to make one that's relevant. So that, I do think, has got to actually be the 11... And in your view, that finding is individual A came into the country through the prior system and committed a bad act. Absent that, is it your argument that he can't do it? No, he can be even a class of people or something like that. But you've got to show that there is an entry that, quote, would be detrimental. Not, you know, some hypothetical or something like that. But, you know, and there's a lot of history behind this. Our brief goes through it, pages 30 to 39, exactly this history. FDR wanted a broader authority, and what Congress said is, you know, no, we're not going to give you that kind of, you know, the United States themselves, spies, saboteurs, war criminals and the like, or possibly at the outer bounds an emergency situation. But this is neither of those, which is what the problem is. And my other part of this question that I wanted, just to follow up on this, is to what extent at all can we look at the President's intent that might be underlying his actions under... I don't think you need to get into anything about the President's intent here, Your Honor. I think you should ask two questions, two fundamental questions. One, has the President made the finding that's required under 1182? And second, is it of any sort of threat that the 150 million nationals are a threat? And then two, is that threat detrimental to the interest of the United States in the way that the Court, I think, would expect it to be, which is, you know, those two categories. And that's what all of the legislative history is about. If I could, maybe I'll turn to Judge Hawkins, your questions about the other argument, about 1152, the other statutory argument. Congress in 1965, and I think that's what this Court's predecessor decision in June recognized, did something sweeping by banning nationality-based discrimination. And my friend says, oh, this is what Presidents have done all the time. Never, ever, ever has a President done this since 1965. When President Johnson introduced the act at his State of the Union address, he said, you know, echoing his same predecessor, quote, a nation built by immigrants of all lands can ask those who now seek admission, what can you do for our country? We should not be asking, in what country were you born? And effectively, that's what this order does. You know, the statute says immigrant visas to the extent of nonimmigrant visas as well. We do think it does. That is, as Judge Friendly said, the year after President Johnson made the statement, the statute, the immigration code is fundamentally altered now. It's altered in a way that says that, you know, you can't have, as a relevant factor, nationality anymore. And that's what this Court's, I think, predecessor decision recognized at the beginning. It didn't squarely reach the question. Last time around, immigrant visas was a smaller percentage of the overall visas affected by Executive Order 2. Now it's a much bigger one. And so even if you disagreed with what I'm saying about Gene v. Nelson and Judge Friendly, this would take out and declare invalid a huge part of the order. And it's exactly the reasons that you found last time around. There is no change whatsoever from Executive Order 2 to 3 when it comes to nationality-based discrimination. Now my friend has said in response to your questions, well, Congress has still left in place the 1182 power, and somehow that should trump 1152. Sorry, that's the wrong word. And with respect to that, I think that, I think this Court answered that in its last opinion by saying 1152 is a later-in-time statute, and it is sweeping, and it admits of only certain exceptions, and one exception is not the President can use 1182 and restore the entire nationality, national origin discrimination system that existed pre-1965. That just can't possibly be what Congress was thinking. Rather, as Judge Paez, you said in the last oral argument, the job of the Court is to reconcile two different statutes. And here you've got one statute that gives the President admittedly broad powers in 1182. It just doesn't extend so far as to say you can discriminate on the basis of nationality. And indeed, Congress, in its text, expressly said to the contrary. Counsel, I have a question for you. Assuming, for sake of argument, that we were to accept the government's position that 1152A only applies to immigrant visas and to nothing else, am I correct that the proclamation here would still fall in total because of the lack of a proper detrimentality determination? Absolutely. So there's two different, there's two totally different statutory violations. There's 1152, which we think covers everything, but as your hypothetical said, assuming only when it covers immigrant visas. It would only take out that part of the order, which is a big part of this Executive Order 3. But our other argument about detrimentality in the finding is an 1182 argument, and that stands totally separate, and it does knock out the entire order, just as last time around when you found 1182, it knocked out the entire order. And they just have not met what you said at page 773 with respect to 1182. If I could, maybe I'll spend a little bit of time on the constitutional claims, because I do think that they're important, and I think, Judge Hawkins, maybe to start with, why does this, why is this religious discrimination? Last time around, you asked my opponent on the other side, the Solicitor General, you said, has the President ever disavowed any of these campaign statements? And he pointed then to some amicus brief and tried to make that argument. I think the record since that time, since we last met, is really quite telling, because in the interim, we had the Fourth Circuit, en banc, say that this Executive Order 2 was a violation of the First Amendment, that it was religious discrimination, that it was effectively a Muslim ban. And in response to that, what was the President's action? Was it to do what I think, you know, any government official thought would do, which is to say, no, this is not a Muslim ban, that's a campaign thing, I'm not doing that? Did the President say anything like that? Absolutely not. Instead... The question you refer to was from the hearing on 1, on May 15, when we were all here. Exactly, on Executive Order 2, yes. And my other question is that in our opinion on 2, E02, we pushed aside constitutional considerations and made our decision only on statutory interpretation. Why should we change that? I don't think you... Otherwise, your argument is, stick with what you've already written. Absolutely, Your Honor. I'm not here saying that you should reach the constitutional reasons unless you disagreed with us on the statutory things. I think that was the logic. Did they rule on constitutional changes? They didn't. My only point, though, is if you disagreed with what our statutory arguments are, which I think would require you to, you know, really disregard everything you wrote back in that, after that May 15 hearing, but if you did for some reason, then I do think you should reach the constitutional arguments here. They are briefed, they are well-developed, and the record has only gotten worse since we last met in May. That is to say that the President has not moved away from his campaign promises, and indeed has just issued a new executive order. And, you know, you can even look to what was said last week as I think a kind of telling indication of bridging the past to the present and rekindling the past. Mr. Katucka, let me take you back to 1182F for just a moment, okay? Suppose that, just theoretically speaking, that we didn't think the finding was sufficient. Or we thought the finding was sufficient, I should say. You know, just looking at it to give a reason. Maybe we went too far in our prior opinion and need to step back. That's just hypothetically speaking. Is there another way in which the President could, we could rely on 1182? Absolutely. So as you were saying to my colleague, asking about the limited nature of this, that is, 1182 does have the words suspend and period. And absolutely, I think this Court recognized last time around in its May 15th, post-May 15th hearing opinion, that the government, the President has to have a rationale that's sufficient to show that it's detrimental to the United States. And as the policy gets longer in time, that rationale has to be better. So, you know, last time around, Jeff, the Solicitor General said, hey, this is only a temporary ban. We only need minimal justification. Now that this is, as you said, a ban of indefinite duration, they do need to justify it with the stronger finding. And that's what the District Court here expressly found, relying on your opinion below. So I don't think that even if you were to find that somehow they met the finding that you called for at page 773, they've met the kind of finding necessary to justify this indefinite ban. I mean, again, no President does anything like this. I mean, their closest examples are so, so far afield. And, you know, of course, the Supreme Court has said, even if the President had done this in the past, it doesn't make it constitutional. But they have. At what point do we reach a serious separation of powers situation? Well, I think if you buy their argument, you're in the separation of powers problem right away, because he wants to gut the role of this Court entirely. I mean, from our perspective, we understand that 1182 gives the President broad powers, but it does have a procedural and a substantive component to it. They've got to make the findings, and the findings have to be sufficient. And under your hypothetical, they've somehow met that they've met the finding, but it still has to be sufficient. And as that ban gets indefinite, it sure looks like a very hard thing for them to do, given the record that they have induced in this executive order. On the issue of indefiniteness, and we could be wrong, but my chambers found 43 orders under 1182. Since it was enacted, only one of them had a time limitation. Absolutely. You know, I'm not here, Judge Hawkins, saying that the President can't make an indefinite order. I am saying that 1182 contemplates a limited one, a period of limited time, and if there is to be, as this Court said last time around, if there is going to be a justification under a finding, as the policy gets longer, that justification does have to be better. And the proclamation which requires periodic reviews and reports and adjustment of the policy, from your perspective, that's not good enough. It's not good enough. First of all, it doesn't even require it, because the last lines of the order say there's no guarantee to any of it. So I don't know that it requires it. But I think ultimately the problem is that the finding isn't justified on its own terms. That is, this is not a circumstance in which they said we distrust individualized vetting or something like that. Indeed, they have all sorts of exceptions for countries, even ones that fail on information sharing and identity management, for individualized vetting. So this is not a kind of coherent document that says we just distrust our own processes or something like that. So I think that's the fundamental problem with it. If there are no other questions, I'll just sum up in half a minute or so. Tomorrow will have been two years to the day since Donald Trump called for a complete and total shutdown of all Muslim immigration to the United States. It will also be another sad anniversary, 76 years since the devastating attack on Pearl Harbor. Pearl Harbor led not only to an assault on our nation's security, but also an assault on its most basic commitments. The walls of this very courthouse where Gordon Hirabayashi was tried bears witness to that tragedy. What the government did then in the name of national security did not make us stronger. It betrayed our values, it betrayed our nation's soul. And rather than defend those values, the courts stood by them. Twice now, this court, reflecting the dissents in those cases, not the majority, has made sure not to repeat that mistake and to avoid the nightmare of Judge Gould's hypothetical of a federal court system that is powerless. This court has twice asserted its vital role as guardians of the law and rejected the President's attempt to flout our Constitution, to flout our laws. We ask that this court do so again. Thank you, counsel. Several points, Your Honor. The first and most important is Mr. Cottrell is absolutely right that this court said last time that the E02 didn't have a finding, that the vetting was inadequate. He is absolutely wrong that the proclamation doesn't have those findings today. And I apologize, but let me just read through the findings just to make clear quite how wrong he is. So from Section 1C of the order, it makes clear that the Secretary of Homeland Security was required to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa. That's what the Secretary of Homeland Security was supposed to find. If you then go to Section 1H of the order, the order sets forth that the Secretary of Homeland Security was supposed to provide a list to private the entry of appropriate categories of foreign nationals of countries that have not provided the information requested. And then, and critically, if you look at Section 1HI of the order, here is the President's key finding, which directly contradicts what he said. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry of those foreign nationals about whom the United States government lacks sufficient information to assess the risks they pose to the United States. I don't know how it could have been any clearer that the proclamation made the finding that this court asked for. You might disagree with the finding, but you cannot disagree that the finding was made. And in fact, he doesn't really argue otherwise, despite having asserted it. What he's really arguing is his argument that the entry has to be harmful in and of itself, that the individual aliens have to impose harm. But he didn't respond to any of the points I made about why that's wrong. He didn't respond to the fact that that wasn't true in the Iranian proclamation, it wasn't true in the Cuban proclamation, it wasn't true in any of the other 40-some-odd proclamations, all of which involved people who engaged in harmful conduct abroad, not when they came here. Indeed, he didn't even challenge in this very proclamation the provisions that apply to Venezuela. The Venezuela restrictions apply to government officials and their family members. No one is arguing that their family members are going to engage in harmful behavior in the United States. The reason that restriction was imposed was to deter and sanction foreign officials who had engaged in harmful behavior towards the United States. He didn't even challenge it, because it is just simply wrong that under 1182F, the individual has to engage in harmful behavior in this country. That has never been what the statute has been about, and they've just gerrymandered that interpretation now, because they recognize that if, as the proclamation finds, the problem here is that there's harms from the foreign governments, and the way we are dealing with that problem is by imposing entry restrictions to encourage the foreign governments to fix the problem. Almost all of their tailoring arguments just fall completely apart. So why does the proclamation, then, with respect to some of the countries, allow for entry of certain categories without any restriction? That was exactly the point I was just making, Your Honor, which is... to change their behavior, and that is not a one-size-fits-all decision. It is an intricate and complicated foreign policy judgment, and the President, relying on his advisers... Well, just to take what you said, I mean, if you take the statement that you read to us and link it back to the concerns about lack of insufficient processes for doing adequate identification of who the applicant might be, and you go over to what they did, say, for example, in Chad, the proclamation suspends immigrant visas, suspends business visas, suspends tourist visas, business-slash-tourist visas, but there's no restriction on a student visa, an exchange visitor visa, and other non-immigrant visas. So if they're concerned really about identity, I don't quite... how does that all line up? Well, as the proclamation explained, Your Honor, the proclamation imposed the strictest sanctions on the countries that were most recalcitrant, and imposed lesser sanctions on countries that do cooperate but are still inadequate. Having varied levels of sanctions based on the degree of recalcitrance of a country is a perfectly rational way to encourage countries to perform. More importantly, they have no explanation at all for why those restrictions are the way they are. On their theory that it's a Muslim ban or something else, why on earth are there exemptions? They can't explain that at all, but the proclamation explains exactly why it is that way. It is tailoring the restrictions in a way that the President and his advisor determined were most likely to encourage foreign governments to change their behavior. The third point I'd like to make, Your Honor, is that he's again and again suggested that this is somehow a way of replacing the INA, overhauling the INA. Yet again, though, there was no response to the D.C. Circus decision in Aberesk, the first Circus decision in Allende, the Supreme Court's decision in Sale, all of which recognized that the President under 1182F can impose additional restrictions over and above what is in 1182A. The fourth point, Your Honor, is on 1152 and nationality discrimination. He said, I believe... I thought Sale dealt with, that was the case of the Haitians, right, coming and entering and they were interdicting the boats as they were coming to the United States, is that correct? That's right, and in that case... And the plaintiffs, they were arguing that claims for asylum and withholding of removal should still apply to those individuals who were on their way to the United States. That's right, Your Honor. And the Supreme Court said, no, those don't apply until they get to the United States. Right, and that's exactly the point, Your Honor. The President used 1182F to thwart the Haitians from being able to invoke the provisions they would have been able to invoke under the INA if they had gotten here, right? I'll have to go back and read the case, but I don't recall... That is exactly... The entire fight in that case was if the Haitians had reached the shores in an exclusion proceeding, they would have been able to invoke all sorts of claims for, I believe it was asylum status, and precisely to avoid that, precisely to avoid that, the President imposed a blockade that prevented them from getting to the shores. The other thing that's interesting about Sale, as Mr. Cattell pointed out, is that the court had no difficulty in reaching the questions that were involved in that case. That's true, Your Honor, but they rejected the claims. Well, they rejected them on the merits. They reviewed the claims, though. Right, but they didn't say that the claims were reviewable, and they didn't have to decide the issue. Well, I mean, why would they go to the extent that they did? I mean, they could have just said these are non-reviewable, and we're not going to review it. Out. They could have, but since they found the statutory issues pretty easy, I think, Your Honor, it was eight to one, and I think that's a pretty reasonable explanation. The fourth point I'd like to make is on 1152 and nationality discrimination. I believe Mr. Cattell said that never, ever, ever has any President engaged in nationality discrimination to deny immigrant visas, but again, that is exactly what President Carter did for Iran, and that is exactly what President Reagan did for Cuba, and he, again, has literally no explanation for that. The last point I'd like to make before I sum up is just on consular non-reviewability. They cited a couple of cases. To be honest, since I don't believe either of those cases were cited in the briefs, I'm not familiar with the first one he cited, but I am familiar with the second, which I believe was Cattell v. Reno. That case didn't involve an order to require an alien to enter the country. What the court said was that the consular officer had to rule on the visa application. It didn't say that the substantive decision would be reviewable. And on consular non-reviewability more generally, their scare tactic that this would mean that there would be no review and Congress's scheme could be totally overridden falls apart when you recognize that these are statutory claims. If Congress is worried, Congress can provide a remedy, and Congress simply has not done so. The last point I would like to make is just... You're saying there would be no remedy unless Congress acted, but Congress could act? Yeah, of course. Congress could, of course, provide a cause of action for the denial of entry to aliens abroad in violation of the INA. The point is that Congress hasn't done so and has never done so, and that is why when consular officers restrict the entry of aliens abroad, even in violation of the statute, there is no review. Thank you. I'm afraid your time, even with the extra five minutes, is more than exceeded. Thank you, Your Honor. I want to comment merely that the advocacy on both sides was exceptionally helpful, and we really appreciate it. Accordingly, the Y.V. Trump case shall now be submitted, and we will try to get an opinion out as soon as practical. I think the Supreme Court has asked us to do that, so we shall comply. Okay, thank you. Court is adjourned. Thank you.
judges: Hawkins, Gould, Paez